James D. **RYAN** and **Holman W. Ryan,**
Co-owners of the **GAS SCREW MO-**
**TOR BOAT WAKIVA #4N-861**

v.

The **NEW ENGLAND DREDGE**
**& DOCK CO.**

**Harry SAMMARCO**

v.

The **NEW ENGLAND DREDGE**
**& DOCK CO.**

**Nos. 55-19, 55-34.**

United States District Court
D. Massachusetts.

March 4, 1957.

———◆———

Morris D. Katz, Boston, Mass., for plaintiff Sammarco.

Frederick D. Vincent, Jr., Boston, Mass., for plaintiff Ryan.

Kneeland & Splane, Boston, Mass., for defendant.

**FORD**, District Judge.

### Findings of Fact

1. These are cases in which plaintiffs seek to recover for the loss of their boats in Lynn Harbor on August 31, 1954, during the course of hurricane Carol.

2. On August 31, 1954, the Yacht Wakiva owned by libellants James D. Ryan and Holman W. Ryan was moored in Lynn Harbor at the Lynn Yacht Club Basin about 600 feet from the nearest shore and about 1,000 feet from a bulkhead extending from Lamphier's Coal Wharf and the Rowland Leather Company slip. A lobster boat owned by libellant Sammarco was moored about 25 feet out from the same bulkhead.

3. During the afternoon and evening of August 30, 1954, following the receipt of warnings of a northeast storm, libellee moved certain floating pipe line sections mounted on pontoons from a position off Revere Beach to positions in Lynn Harbor.

4. A double row of these pontoons, consisting of two strings of pontoons, each made up of 15 pontoon sections each 40 feet in length was moored in a northeast southwest direction, the northeast end of this double line being lashed with wire or rope to a dolphin about 20 feet from the end of the bulkhead near the leather company slip. There was a 1,300 pound anchor at the other end of this line of pontoons and 6 or 7 anchors of 200 to 500 pound weight at intervals along the line.

5. A single row of 10 similar pontoons was moored in a northeast southwest direction about 800 or 900 feet from the bulkhead. This line was secured by 5 or 6 anchors each of 300 to 500 pound weight.

6. On the morning of August 31, 1954, during the height of the hurricane these lines of pontoons dragged their anchors and moved inward across the harbor toward the bulkhead. Sammarco's lobster boat, which was moored between the bulkhead and the double row of pontoons, held fast to its moorings and

was crushed and sunk by the pontoons of this double row as they moved toward the bulkhead.

7. The Wakiva likewise dragged its anchor and was carried inward to a spot a few feet off the bulkhead where it sank after being hit by pontoons from the outer row which had also been carried in toward the bulkhead from the position where they had been anchored the previous evening.

8. The course of the wind which actually occurred on August 31, 1954, was not to have been anticipated. The forecasts of the United States Weather Bureau were consistently for northeast winds until early in the morning of August 31, 1954, when the first forecast was issued indicating that the winds would be easterly and then turning southerly. The hurricane advisory forecasts indicated that the hurricane's course would be to the east of the coast of Massachusetts, resulting in northeast winds only for the coast of Massachusetts, and these advisories were not changed until early in the morning of August 31, 1954.

9. The pontoons of the New England Dredge & Dock Company had been moored properly in a northeast southwest direction so as to present the least possible surface to the wind and were moored with sufficient anchors to hold them against the reasonably to be expected storm. The pontoons were also moored in such a way that had the northeast winds materialized and the pontoons broken loose, they would not have damaged any craft in the vicinity.

10. There was no negligence on the part of those in charge of the pontoons. Sufficient anchors were laid out, and after the storm had started it was not reasonable to expect the men in charge of the pontoons to proceed in the midst of the hurricane to attempt any further measures to secure the pontoons. The evidence shows that the water was extremely rough in the inner harbor and the winds reached at times approximately 100 miles per hour. The roughness of weather is attested to be the fact that

the pontoons were washed over and onto a ten foot high pier or bulkhead between Lamphier's Coal Wharf and the leather company slip. The winds on the morning of August 31, 1954, were northeast and were blowing, as testified to by Mr. Ryan, from the Lynn Yacht Club toward the outer harbor and in demonstrating the direction on the chart used in the court room, this was the same direction in which both sections of pontoons were moored. It was only at approximately 10:15 a.m. Standard Time that the winds veered from the northeast to the east and subsequently to the southeast.

11. Sufficient warning of the approach of the hurricane was not given to the public, *and in view of the fact that only 3 out of 117 hurricanes between 1900 and 1954, had veered inland* at or about the New England coast, the superintendent in charge of the mooring of the pontoons could reasonably rely on forecasts only of northeast winds until almost the actual occurrence of easterly and southeasterly winds. As a finding of fact, the Court finds that the pontoons were adequately moored and anchored, and the libellee anchored the pontoons in the best possible position in view of the United States Weather Bureau forecasts; and that the libellee was not negligent in failing to leave a person aboard these pontoons to inspect lines; and that the libellee was not negligent in failing to order the vessels under its control to attempt in a hurricane to further secure the pontoons. The Court finds that the person in charge of the libellee's pontoons did everything which a reasonable person could do in anticipation of the storm forecast; and the Court finds that the libellee could not have anticipated the collision which occurred.

12. The Court finds that the libellee removed its pontoons from the exposition on Revere Beach to Lynn Harbor and moored these pontoons in a place where in view of the forecasts, they would probably do no damage to other craft.

13. The evidence which was introduced showed that this collision between the pontoons and the Yacht Wakiva and the

lobster boat belonging to Harry Sammarco was an inevitable accident; that the master or superintendent in charge of the pontoons had acted carefully and as a reasonable man; and that the drifting of the pontoons was a vis major which human skill and precaution could not have prevented.

#### Conclusions of Law

1. Libellants have failed to show by a fair preponderance of the evidence that there was any negligence on the part of the libellee or its servants or agents.

2. Libellee has sustained the burden of proving that the collisions resulted from a cause which human skill and foresight could not have prevented in the exercise of ordinary prudence.

3. Libellants are not entitled to recover damages from libellee for the loss of their boats.

Libels dismissed with costs.